United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 24, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

Case No. 02-30975
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ANDRE R FERGUSON

Defendant-Appellant

_____

Appeal from the United States District Court
for the Middle District of Louisiana
(02-CR-18)
_____

Before KING, Chief Judge, and HIGGINBOTHAM and BARKSDALE, Circuit
Judges.

PER CURIAM[*]:

At the defendant's sentencing hearing, the district court
increased the defendant's criminal history category one level (from
level I to level II) and increased his total offense level five
points (from a total offense level of 16 to a total offense level
of 21).  On appeal, we are asked to determine whether the district
court erred in upwardly departing from the Sentencing Guidelines
regarding both the criminal history category and the total offense

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

level and, if not, whether the degree to which the district court departed is reasonable.

## I. FACTS AND PROCEDURAL BACKGROUND

The defendant Andre R. Ferguson, doing business as Andre Arms ("Andre's"), operated a firearms store in Baton Rouge, Louisiana. In this capacity, Ferguson came under the scrutiny of the Bureau of Alcohol, Tobacco and Firearms ("ATF") for allegedly selling firearms to convicted felons between March 23, 1998 and February 14, 2000. Subsequently, on April 19, 2002, Ferguson entered a plea of guilty to five counts of selling firearms to prohibited persons in violation of 18 U.S.C. § 922(d)(1).[1]

In accordance with U.S.S.G. § 2K2.1(a)(6), which applies to convictions under § 922(d), the pre-sentence report ("PSR") assigned Ferguson a base offense level of 14.[2] In addition to the five firearms listed in the information, the PSR provided that Ferguson unlawfully sold seventeen other firearms, bringing the

---

[1] The district court approved the waiver of indictment and filed a superseding bill of information charging Ferguson with five counts of selling firearms to prohibited persons.

[2] Section 2K2.1 of the Sentencing Guidelines, entitled, "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition," provides, in relevant part:

(a) Base Offense Level (Apply the Greatest):
. . .
    (6) 14, if the defendant (A) was a prohibited person at the time the defendant committed the instant offense; or (B) is convicted under 18 U.S.C. § 922(d).

U.S. SENTENCING GUIDELINES MANUAL, § 2K2.1(a)(6) (2001).

total number of firearms at issue for sentencing purposes to twenty-two. Under § 2K2.1(b)(1)(B), because Ferguson's offense involved between eight and twenty-four firearms, his offense level was increased by four levels to 18.[3] After subtracting two levels for acceptance of responsibility, Ferguson's base offense level was reduced to 16. Because Ferguson had no prior juvenile adjudications, adult criminal convictions or other arrests, his total criminal history points totaled zero. As a result, he was assigned a criminal history category of level I. A criminal history category of level I and an accompanying total offense level of 16 results in a guideline range of twenty-one to twenty-seven months.

After giving Ferguson notice that it intended to upwardly depart, the district court heard argument regarding the merits of the intended departure. Following this (second) sentencing hearing, the district court upwardly departed from a criminal history category of level I to a criminal history category of level II and from a total offense level of 16 to a total offense level of

---

[3]     Sub-section 2K1.2(b)(1)(B) provides, in relevant part:

(b)   Specific Offense Characteristics
      (1)   If the offense involved three or more firearms,
            increase as follows:
. . .
            (B)   8-24          add 4
            (C)   25-99         add 6
            (D)   100-199       add 8
            (E)   200 or more   add 10 . . . .

Id. § 2K2.1(b)(1)(B).

3

21, resulting in a guideline range of forty-one to fifty-one months. Ferguson was sentenced to forty-eight months on each count, to be served concurrently.

On September 13, 2001, a final judgment was entered by the district court. In addition to this term of imprisonment, the district court imposed a three-year term of supervised release for each count, to run concurrently and imposed a $500.00 special assessment. Ferguson timely appeals from this judgment.

## II. STANDARD OF REVIEW

Our review of a sentence under the guidelines is "confined to determining whether a sentence was imposed in violation of law or as a result of an incorrect application of the sentencing guidelines." United States v. Shipley, 963 F.2d 56, 58 (5th Cir. 1992). Further, we apply an abuse of discretion standard to the district court's decision to depart upward and will "affirm a departure from the Guidelines 'if the district court offers acceptable reasons for the departure and the departure is reasonable.'" See United States v. Ashburn, 38 F.3d 803, 807 (5th Cir. 1994) (en banc)(quoting United States v. Lambert, 984 F.2d 658, 663 (5th Cir. 1993) (en banc)).

## III. ANALYSIS OF THE DEFENDANT'S SENTENCE

To support its request for an upward departure, the government called several witnesses. First, Special Agent Paul Rash with the ATF testified that during the ATF's investigation of Ferguson

4

(which spanned over ten years), Ferguson allowed a confidential informant, whom Ferguson believed to be a convicted felon, to pay for and take possession of firearms over six times.

As further explained by Agent Rash, a firearms trace results when the dealer responsible for selling a gun recovered from a crime scene is contacted by the ATF to reveal the purchaser of the firearm.  Agent Rash testified that Ferguson had been contacted approximately 124 times regarding guns recovered at crime scenes.

Agent Rash further testified regarding the results of a search conducted (pursuant to a search warrant) of Andre's, and specifically detailed discrepancies in Ferguson's records and receipts uncovered during the search.  For example, Agent Rash discussed Ferguson's Acquisition and Disposition book (the "A&D book") and his ATF Form 4473's.  A firearms licensee is required to log acquisitions and dispositions of firearms in his A&D book in accordance with 18 U.S.C. § 923's licensing provisions, and Form 4473's are required to be completed by a firearm purchaser to allow for the purchaser's criminal background check.  As to a number of entries in Ferguson's A&D book, the firearm disposition entry was left blank.  Further, as to the majority of the Form 4473's, the Forms were completed in their entirety (including entry of the purchaser's name and his or her driver's license number), except the firearm to be purchased entry was completely left blank.  As relayed by Agent Rash, this led the ATF to believe that Ferguson would substitute these partially-completed Form

4473's when an individual failed a background check. Agent Rash also discussed that "an extremely large percentage of the forms" were executed by black females purchasing large quantities of handguns. At least ten of these women were contacted. The women told agents that they were required to execute paperwork several times because Ferguson told them their original paperwork could not be located, and, in one instance, a woman told agents that she had <u>never</u> provided information to Andre's for a gun purchase.

Agent Rash also testified that, prior to the search of Andre's, Ferguson gave approximately 148 partially-completed Form 4473's to his friend Willie Shelton for safe-keeping. Agent Rash had contacted several of the individuals identified as purchasers on these Form 4473's; in several instances ("at least ten or twelve so far"), Agent Rash uncovered evidence of wrongdoing. For example, Denita Barlow told Agent Rash that Ferguson paid her and a number of other girls to sign a large volume of blank ATF Form 4473's. Additionally, in an interview with Agent Rash, Darlene Spears stated that she had made about a dozen straw purchases through Ferguson; "Locket" and Tehera Rashide stated that they had also made straw purchases through Ferguson.

Special Agent Jeff Methvin with the Federal Bureau of Investigation ("FBI") testified next. He testified regarding a connection between Kreglin Gaines, who the FBI was investigating for narcotics trafficking activities, and Ferguson. Specifically, the FBI intercepted several telephone conversations between Gaines

6

and Ferguson wherein Ferguson compared a group of individuals purchasing guns from him to "Al Capone" and "professionals" and specifically discussed one of the members as the "shooter" or "trigger man." In a subsequent conversation, Ferguson and Gaines discussed Ferguson obtaining identification and/or a driver's license for a mutual friend, referred to as "Rodney." Agent Methvin testified regarding his belief that this was Rodney Lee, a known drug associate of Gaines who was subsequently arrested using a false identification card.

Finally, Gary Orchowski, Special Agent for the ATF National Tracing Center Division testified on behalf of the government as an expert in the area of firearms trace analysis. Specifically, he testified regarding a "time to crime" factor used in firearms trace analysis. This factor measures the time from sale of a gun until when it is recovered by law enforcement. As relayed by Agent Orchowski, the national time to crime average for the year 2000 was 6.1 years and for the year 2001 was 8.1 years and the time to crime average for Baton Rouge for the year 2000 was 4.2 years; however, the time to crime average for Andre's for the year 2001 was 2.17 years, "indicat[ing] [] that Andre's Arms was definitely involved in firearms trafficking schemes with other individuals."[4]

_____

    [4]    Agent Orchowski did not have a time to crime figure for Andre's in 2000.

Agent Orchowski also testified as to the approximately 120 firearms traced from crime scenes to Andre's. Of these, ninety-six percent were handguns; of these handguns, seventy-nine percent were semiautomatic pistols. Further, of the firearms traced to Andre's, thirty-one were involved in possession of a weapon cases, twenty-one were involved in narcotics cases, eighteen were involved in weapons offense cases, ten were involved in violent cases, eight were involved in aggravated assault cases, three were involved in robbery cases, one was involved in a kidnapping case and six were involved in homicide cases.

A district court may depart upward from the Sentencing Guidelines if the court finds that an aggravating circumstance exists that was not adequately taken into consideration by the Sentencing Commission. 18 U.S.C. § 3553(b). Here, tethered to the above cited evidence, the district court concluded that a criminal history category of level I did not adequately reflect the seriousness of Ferguson's past conduct or the likelihood that he would commit additional crimes in the future. Additionally, it found the unusual circumstances of this case justified an upward departure from the total offense level of 16 to a total offense level of 21. In so doing, the district court gave detailed reasons, on the record, for its decisions to depart.

Regarding Ferguson's criminal history category, Chapter 4 of the guidelines, § 4A1.3 authorizes a district court to depart upward "[i]f reliable information indicates that the criminal

8

history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes . . . ." U.S. SENTENCING GUIDELINES MANUAL, § 4A1.3. In deciding whether to depart because of the defendant's criminal history, subsection (e) expressly authorizes the court to consider "prior similar adult criminal conduct not resulting in a criminal conviction." Id. § 4A1.3 (policy statement).

United States Code Title 18, § 923(m), makes it unlawful for any licensed dealer to fail to make an appropriate entry or to fail to maintain any record which he is required to keep under 18 U.S.C. § 923. Both ATF Agent Rash and Special Agent Orchowski testified as to Ferguson's numerous violations of these licensing provisions. Not only did Ferguson's poor maintenance of the A&D book violate licensing provisions, but also his maintenance of partially completed Form 4473's violated licensing provisions (including those found in his office and those Form 4473's that were given to Willie Shelton). The evidence that Ferguson was allowing straw purchases of firearms to be made and, indeed, was paying many black females to partially complete blank Form 4473's further supports the district court's departure based upon "prior similar adult criminal conduct not resulting in a criminal conviction." The district court did not abuse its discretion in reasonably increasing Ferguson's criminal history category one level.

Regarding the district court's decision to depart upward from Ferguson's calculated total offense points, § 5K2.0, entitled "Grounds for Departure (Policy Statement)" in Chapter 5 of the Guidelines, expressly limits departures of the nature involved here to unusual cases that fall outside of the heartland of cases in the Guideline. The commentary to this policy statement quotes from <u>Koon v. United States</u>, 518 U.S. 81 (1996), in stating that "[w]hether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases." <u>Id.</u> at 98. Section 5K2.14, entitled "Public Welfare (Policy Statement)," gives an example of certain unusual circumstances that may warrant departure:

> If national security, public health, or safety was significantly endangered, the court may increase the sentence above the guideline range to reflect the nature and circumstances of the offense.

U.S. SENTENCING GUIDELINES MANUAL, § 5K2.14 (policy statement).

Pursuant to these provisions, the district court did not abuse its discretion in finding that the exceptional circumstances of this unusual case cause it to fall outside of the heartland of cases in the Guideline governing Ferguson's sentence for a violation of 18 U.S.C. § 922(d)(1) – § 2K2.1. The high number of traces, the types of crimes where guns were recovered (including

10

narcotics, homicide, kidnapping and robbery), and the disparate time to crime statistic presents a situation where "public health, or safety was significantly endangered" to an extraordinary degree. Further, as evidenced by the transcript from the sentencing hearing, the district court first considered, but then rejected as unjustified on the facts of this case, a gradual increase in Ferguson's total offense level. In these circumstances, the five point departure is reasonable. <u>See, e.g.</u>, <u>United States v. McKenzie</u>, 991 F.2d 203, 206 (5th Cir. 1993); <u>United States v. Webb</u>, 950 F.2d 226, 231-32 (5th Cir. 1991).

## V.   CONCLUSION

We AFFIRM Ferguson's judgment of conviction and sentence.

11